GREGG COSTA, Circuit Judge,
joined by OWEN and HIGGINSON, Circuit Judges,
concurring:
This case involves two serious problems that arise all too frequently in today’s classrooms: violence and sexual harassment. Judge, Dennis’s dissent points out that the harassment of female students is a matter of vital public concern that Bell’s song sought to expose. The problem for Bell is that his song — with its graphic discussion of violence against the coaches— goes well beyond blowing the whistle on the alleged harassment.
Judge Dennis’s dissent contends that these whistleblowing aspects of the song nonetheless entitle the speech to “special protection” under the First Amendment. Dissent at 403, 410. It treats this argument as a separate basis for ruling in Bell’s favor. But fitting this case within Snyder v. Phelps, public employee speech cases like Pickering, and the litany of other cited cases assumes that Tinker is not implicated. Tinker, of course, involved speech on not just a matter of public concern, but the public concern of its day — the *403 war in Vietnam. Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 504, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Yet the Court still balanced the value of that speech against its impact on the learning environment. See id. at 509, 89 S.Ct. 733. That disruption analysis may well have come out differently had the Tinkers combined their armband protest with talk of violence. Identifying some aspect of Bell’s song that addresses a matter of public concern therefore is not enough to elevate it above the Tinker framework unless Tinker does not apply to this type of off-campus speech (in which case the speech would enjoy First Amendment protection from school discipline so long as it constitutes any form of protected speech, not just the “highest rung”).
Whichever First Amendment doctrine one tries to latch onto, the inescapable question is thus whether Tinker’s balancing approach governs “off-campus” student speech that is directed at the school community. For the reasons discussed in the majority opinion, along with the views expressed by every other circuit that has taken a position on this issue, I agree that it does, at least when the speech is threatening, harassing, and intimidating as it is here.
Broader questions raised by off-campus speech will be left for another day. That day is coming soon, however, and this court or the higher one will need to provide clear guidance for students, teachers, and school administrators that balances students’ First Amendment rights that Tinker rightly recognized with the vital need to foster a school environment conducive to learning. That task will not be easy in light of the pervasive use of social media among students and the disruptive effect on learning that such speech can have when it is directed at fellow students and educators. Indeed, although Judge Dennis’s dissent extols the aspects of Bell’s song that sought to combat sexual harassment, the blanket rule it advocates — one that would deprive schools of any authority to discipline students for off-campus speech published on social media no matter how much it disrupts the learning environment — would allow sexual harassment and ferocious cyberbullying that affect our classrooms to go unchecked. See Morrow v. Balaski, 719 F.3d 160, 164 (3d Cir.2013) (describing multiple cyberbullying incidents in which students were threatened by phone and on MySpace by another student); S.J.W. ex rel. Wilson v. Lee’s Summit R-7 Sch. Disk, 696 F.3d 771, 773 (8th Cir.2012) (explaining that students’ posts on a blog they created “contained a variety of offensive and racist comments as well as sexually explicit and degrading comments about particular female classmates, whom they identified by name”); Kowalski v. Berkeley Cnty. Sch., 652 F.3d 565, 568 (4th Cir.2011) (detailing online bullying incident in which high school students created web-page called “Students Against Shay’s Herpes” in reference to another high school student).
With these additional observations, I join the majority opinion.
JAMES L. DENNIS, Circuit Judge,
with whom GRAVES, Circuit Judge, joins in full, and with whom PRADO, Circuit Judge, joins except as to Parts I and II. B.,
dissenting:
Although mischaracterizing itself as “narrow” in scope, the en banc majority opinion broadly proclaims that a public school board is constitutionally empowered to punish a student whistleblower for his purely off-campus Internet speech publicizing a matter of public concern. As if to enforce the adage that “children should be seen and not heard,” the majority opinion *404 holds that the Itawamba County School Board did not violate the First Amendment when it suspended high school senior Taylor Bell for composing and posting a rap song on the Internet using his home computer during non-school hours, which criticized two male teachers for their repeated sexual harassment of minor female students. In my view, the majority opinion commits serious constitutional and summary-judgment procedural errors because: (1) Bell is entitled to summary judgment because his off-campus rap song was specially protected speech on a matter of public concern; (2) the School Board was not authorized by Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), to censor students’ off-campus online speech; and (3) even assuming arguendo that Tinker granted the School Board power to censor such speech, the School Board was not entitled to summary judgment under Tinker, because the evidence, viewed in the light favorable to the non-movant, Bell, does not support the conclusion that Bell’s speech caused a substantial disruption of school activities or justified a reasonable forecast of such a disruption by school officials. The majority opinion thereby denigrates and undermines not only Bell’s First Amendment right to engage in off-campus online criticism on matters of public concern but also the rights of untold numbers of other public school students in our jurisdiction to scrutinize the world around them and likewise express their off-campus online criticism on matters of public concern. In doing so, the majority opinion obliterates the historically significant distinction between the household and the schoolyard by permitting a school policy to supplant parental authority over the propriety of a child’s expressive activities on the Internet outside of school, expanding schools’ censorial authority from the campus and the teacher’s classroom to the home and the child’s bedroom.
As detailed herein, the majority opinion commits a number of fundamental errors that necessitate highlighting lest readers be misinformed by its version of the relevant facts and law. First and foremost, the majority opinion erroneously fails to acknowledge that Bell’s rap song constitutes speech on “a matter of public concern” and therefore “occupies the highest rung of the hierarchy of First Amendment values.” See Snyder v. Phelps, 562 U.S. 443, 452, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (internal quotation marks and citation omitted). Instead, by narrowly focusing its analysis on a few, plainly rhetorical lyrics in Bell’s song, the majority opinion wholly glosses over the urgent social issue that Bell’s song lays barp and thus flouts Supreme Court precedent requiring us to evaluate whether “the overall thrust and dominant, theme of [Bell’s song] spoke to broader public issues” — which it did. See id. at 454, 131 S.Ct. 1207.
Second, in drastically expanding the scope of schools’ authority to regulate students’ off-campus speech, the majority opinion disregards Supreme Court precedent establishing that minors are entitled to “significant” First Amendment protection, including the right to engage in speech about violence or depicting violence, and that the government does not enjoy any “free-floating power to restrict the ideas to which children may be exposed.” See Brown v. Entm’t Merchants Ass’n, — U.S. -, 131 S.Ct. 2729, 2735-36, 180 L.Ed.2d 708 (2011). Similarly, the majority opinion also altogether fails to consider Supreme Court precedents that substantially restrict the government’s ability to regulate Internet speech, Reno v. American Civil Liberties Union, 521 U.S. 844, 868-70, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), and the extent to which the *405 majority opinion’s vague framework fails to provide constitutionally adequate notice of when student speech crosses the line between permissible and punishable off-campus expression, see id. at 871-72, 117 S.Ct. 2329; accord Brown, 131 S.Ct. at 2744-46 (Alito, J., concurring). Further, by deriving its rule from a school policy that focuses on whether a layperson might view Bell’s speech as “threatening,” “harassing,” or “intimidating,” the majority opinion ignores First Amendment precedents demanding that the government prove more than mere negligence before imposing penalties for so-called “threatening” speech. See Virginia v. Black, 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003); N.A.A.C.P. v. Claiborne Hardware Co., 458 U.S. 886, 904, 928-29, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982).
Third, by holding that the Tinker framework applies to off-campus speech like Bell’s, the majority opinion simply ignores that Tinker’s holding and its sui generis “substantial-disruption” framework are expressly grounded in “the special characteristics of the school environment,” Tinker v. Des Moines Indep. Cmty. Sch. Disk, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), and the need to defer to school officials’ authority “to prescribe and control conduct in the schools,” id. at 507, 89 S.Ct. 733 (emphasis added), whereas Bell’s rap song was recorded and released entirely outside the school environment. The Court’s post-Tinker precedents make clear this critical distinction. See, e.g., Morse v. Frederick, 551 U.S. 393, 422, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (Alito, J., concurring) (noting that Tinker allows schools to regulate “in-school student speech ... in a way that would not be constitutional in other settings”). In this regard, the majority opinion also fails to account for the vital fact that the Tinker framework is far too indeterminate of a standard to adequately protect the First Amendment right of students, like Bell, to engage in expressive activities outside of school, as well as their parents’ constitutional right to direct their children’s upbringing and the First Amendment right of adults and children alike to receive students’ speech. In other words, the majority opinion allows schools to police their students’ Internet expression anytime and anywhere — an unprecedented and unnecessary intrusion on students’ rights.
Fourth and finally, the majority opinion also errs in its very application of the Tinker framework. As detailed in the panel majority’s opinion, the summary-judgment evidence simply does not support the conclusion, as required by Tinker, that Bell’s song substantially disrupted school activities or that school officials reasonably could have forecasted that it would do so. In reaching the opposite conclusion, the majority opinion not only fails to view the summary-judgment evidence in the light most favorable to the non-movant, Bell, accord Tolan v. Cotton, — U.S. -, 134 S.Ct. 1861, 1865, 188 L.Ed.2d 895 (2014), but also dilutes the Tinker “substantial-disruption” framework into an analytic nullity.
Even in the most repressive of dictatorships, the citizenry is “free” to praise their leaders and other people of power or to espouse views consonant with those of their leaders. “Freedom of speech” is thus a hollow guarantee if it permits only praise or state-sponsored propaganda. Freedom of speech exists exactly to protect those who would criticize, passionately and vociferously, the actions of persons in power. But that freedom is denied to Bell by the majority opinion because the persons whose conduct he dared to criticize were school teachers. If left uncorrected, the majority opinion inevitably will encourage school officials to silence student speakers, like Taylor Bell, solely because *406 they disagree with the content and form of their speech, particularly when such off-campus speech criticizes school personnel. Such a precedent thereby clearly contravenes the basic principle that, “[i]n our system, students may not be regarded as closed-circuit recipients of only that which the States chooses to communicate. They may not be confined to expression of those sentiments that are officially approved.” Tinker, 393 U.S. at 511, 89 S.Ct. 733. Today, however, the majority opinion exempts the children of Texas, Louisiana, and Mississippi from this long-established constitutional safeguard. Because the majority opinion’s undue deference to a public school board’s assertion of authority to censor the speech of students while not within its custody impinges the very core of our Constitution’s fundamental right to free speech, I respectfully but emphatically dissent.
I.
The en banc majority opinion completely ignores Bell’s argument that the School Board violated his First Amendment rights in punishing him for his rap song, which he contends was protected speech on “a matter of public concern.” Although Bell strenuously made his “speech on a matter of public concern” argument at every opportunity, including at the en banc oral argument, the en banc majority opinion fails to address this critical point. Instead, the majority opinion transforms the Itawamba County School Board disciplinary policy into an unprecedented rule of constitutional law that effectively permits school officials across our Circuit to punish a student’s protest of teacher misconduct regardless of when or where the speech occurs and regardless of whether the student speaker is, at the time of the speech, an adult or a minor fully within the custody and control of his or her parents. I respectfully but strongly disagree with the majority opinion’s silent rejection of Bell’s argument, not only because Bell’s argument is meritorious, but also because the opinion’s sub silentio decision of the issue presented has led it into several serious and unfortunate constitutional errors.
Speech on “matters of public concern” is “at the heart of the First Amendment’s protection.” Snyder v. Phelps, 562 U.S. 443, 451-52, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (internal quotation marks and citation omitted). “The First Amendment reflects ‘a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.’ ” Id. at 452, 131 S.Ct. 1207 (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). “That is because ‘speech concerning public affairs is more than self-expression; it is the essence of self-government.’ ” Id. (quoting Garrison v. Louisiana, 379 U.S. 64, 74-75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)). “Accordingly, ‘speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.’ ” Id. (quoting Connick v. Myers, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).
Although the Supreme Court has noted that “the boundaries of the public concern test are not well defined,” San Diego v. Roe, 543 U.S. 77, 83, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (per curiam), it has “articulated some guiding principles, principles that accord broad protection to speech to ensure that courts themselves do not become inadvertent censors,” Snyder, 562 U.S. at 452, 131 S.Ct. 1207. “Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, *407 a subject of general interest and of value and concern to the public.” Id. at 453, 131 S.Ct. 1207 (internal quotation marks and citations omitted). “The arguably ‘inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.’ ” Id. (quoting Rankin v. McPherson, 483 U.S. 378, 387, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)).
Determining whether speech involves a matter of public concern “requires us to examine ‘the content, form, and context’ of th[e] speech, as revealed by the record as a whole.” Id. (quoting Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 761, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985)). “As in other First Amendment cases, the court is obligated ‘to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.’ ” Id. (quoting Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)). “In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said.” Id. at 454, 131 S.Ct. 1207.
In Snyder, the Supreme Court applied this framework to hold that the First Amendment barred an aggrieved father from recovering for, inter alia, intentional infliction of emotional distress, against an anti-gay church congregation whose picketing coincided with the funeral of his son, who was a marine, notwithstanding the alleged outrageousness and hurtfulness of the picketers’ speech to Snyder.[1] 562 U.S. at 460,131 S.Ct. 1207. Specifically, in that ease, Fred Phelps, the founder of the Westboro Baptist Church, traveled to Maryland, along with six parishioners, in order to hold a protest on public property 1,000 feet from the funeral of Marine Lance Corporal Matthew Snyder, who was killed in Iraq in the line of duty. Id. at 448, 131 S.Ct. 1207. The picketing was conducted under police supervision and out of the sight of those at the church. Id. at 457, 131 S.Ct. 1207. The protest was not unruly; there was no shouting, profanity, or violence. Id. The record confirms that any "distress occasioned by Westboro’s picketing turned on the content and viewpoint of the message conveyed, rather than any interference with the funeral itself. Id. The picketers peacefully displayed signs that read “God Hates the USA/ Thank God for 9/11,” “America is Doomed,” “Don’t Pray for the USA,” “Thank . God for IEDs,” “Thank God for Dead Soldiers,” “Pope in Hell,” “Priests Rape Boys,” “God Hates Fags,” “You’re Going to Hell,” and “God Hates You.” Id. at 448, 131 S.Ct. 1207. The Westboro picketers displayed these signs for about 30 minutes before the funeral began. Id. at 449,131 S.Ct. 1207.
Snyder’s father thereafter filed a diversity action against Phelps and other picketers alleging, inter alia, state tort claims of intentional infliction of emotional distress, intrusion upon seclusion, and civil conspiracy. Id. at 449-50, 131 S.Ct. 1207. After a jury awarded millions of dollars in damages, Phelps and his congregants argued that they were entitled to judgment as a matter of law because the First Amendment fully protected their speech. Id. at 450, 131 S.Ct. 1207. The district *408 court reduced the punitive damages award, but left the verdict otherwise intact. Id. The Fourth Circuit reversed, concluding that Westboro’s statements were entitled to First Amendment protection because those statements “were on matters of public concern, were not provably false, and were expressed solely through hyperbolic rhetoric.” Id. at 451,131 S.Ct. 1207.
The Supreme Court granted certiorari and affirmed. Id. at 461, 131 S.Ct. 1207. Evaluating the “content, form and context” of the congregants’ protest, the Court concluded that Westboro’s speech addressed a matter of public concern and was entitled to “special protection” under the First Amendment, thus barring Snyder from recovering in tort on the basis of the “outrageousness” of their speech. Id. at 458,131 S.Ct. 1207. According to the Court:
Such speech cannot be restricted simply because it is upsetting or arouses contempt. “If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.” Texas v. Johnson, 491 U.S. 397, 414 [109 S.Ct. 2533, 105 L.Ed.2d 342] (1989). Indeed, “the point of all speech protection ... is to shield just those choices of content that in someone’s eyes are misguided, or even hurtful.” Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston,[], 515 U.S. 557, 574 [115 S.Ct. 2338, 132 L.Ed.2d 487] (1995).
Id. Further, the Court concluded:
Westboro believes that America is morally flawed; many Americans might feel the same about Westboro. Westboro’s funeral picketing is certainly hurtful and its contribution to public discourse may be negligible. But Westboro addressed matters of public import on public property, in a peaceful manner, in full compliance with- the guidance of local officials. The speech was indeed planned to coincide with Matthew Snyder’s funeral, but did not itself disrupt that funeral, and Westboro’s choice to conduct its picketing at that time and place did not alter the nature of its speech.
Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and — as it did here — inflict great pain. On the facts before us, we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course — to protect even hurtful speech on public issues to ensure that we do not stifle public debate. That choice requires that we shield Westboro from tort liability for its picketing in this case.
Id. at 460-461, 131 S.Ct. 1207.
Applying these principles to the instant case, the record indisputably reveals that Bell’s speech addressed a matter of public concern. Bell composed his song after a number of his female friends at school informed him that Coaches Wildmon and Rainey had frequently sexually harassed them during school. The lyrics of Bell’s song[2] describe in detail the female students’ allegations of sexual misconduct, e.g., describing Coach Wildmon as “telling students that they [were] sexy,” and Coach Rainey as “rubbing on the black girls’ ears in the gym.” With a darkly parodie — and, by many standards, crude — tone, the song ridicules the coaches for their outrageously inappropriate conduct with the female students, e.g., describing one coach as having “drool running down [his] mouth” while he “look[s] down girls’ shirts,” and positing that Wildmon is “fucking around” *409 because of his wife’s appearance (the song states that “his wife ain’t got no titties”).[3] By describing Rainey as “Bobby Hill the second,” the song also draws parallels between the coaches’ alleged sexual misconduct and the alleged sexual misconduct of a former Itawamba coach, Bobby Hill, who was arrested the previous year for sending sexually explicit text messages to a female student. Although the song does contain some violent lyrics, the song’s overall “content” is indisputably a darkly sardonic but impassioned protest of two teachers’ alleged sexual misconduct, e.g., opining that Rainey is “a fool/30 years old fucking with students at the school.” That Bell’s song may fall short of the School Board’s aesthetic preferences for socio-political commentary is not relevant to determining whether the rap song’s content addresses a matter of public concern. See, e.g., Snyder, 562 U.S. at 458, 131 S.Ct. 1207 (observing that “[t]he arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern”) (internal quotation marks omitted). In Snyder, the Supreme Court explicitly rejected the argument that the crude and egregiously offensive messages on the anti-gay protesters’ signs — which included “Fag Troops,” “God Hates the USA/Thank God for 9/11” and “Thank God for Dead Soldiers” — should affect the inquiry into whether the signs addressed a matter of public concern. Id. at 454, 131 S.Ct. 1207. According to the Court, “[wjhile these messages may fall short of refined social or political commentary, the issues they highlight ... are matters of public import.” Id. So much more so here where Bell addresses a serious issue of alleged teacher sexual misconduct toward minor students. Indeed, similar to Snyder, even if some of Bell’s lyrics were crude and contained violent imagery, “th[is] would not change the fact that the overall thrust and dominant theme of [Bell’s song] spoke to broader public issues.” See id.
The “form” of Bell’s speech, ie., a rap song, likewise militates in favor of finding that it addresses a matter of public concern. It is axiomatic that music, like other art forms, has historically functioned as a mechanism to raise awareness of contemporary social issues.[4] Rap is no exception. “Over the past twenty years there has been extensive academic discourse on the role of rap music ... as a form of political expression.” Commonwealth v. Gray, 463 Mass. 731, 755 n. 24, 978 N.E.2d 543 (2012) (collecting authorities). A long aspiring rap artist himself,[5] Bell invoked this same tradition by deploying the artistic conventions and style of the rap genre in order to critique the coaches’ sexual harassment of female students.
*410 Finally, the “context” of Bell’s speech likewise evinces that it addresses a matter of public import. By releasing his song on the Internet, Bell sought to bring attention to the coaches’ sexual misconduct against his female classmates, just as the Westboro group in Snyder sought to bring attention to its protest by picketing in public. See Snyder, 562 U.S. at 454-55, 131 S.Ct. 1207 (concluding that the “context” of “[the protesters’] signs, displayed on public land next to a public street, reflect the fact that the church finds much to condemn in modern society”). In a monologue introduction on the YouTube version of his song, Bell described the genesis of the rap as follows:
A lot of people been asking me lately you know what was my reasoning behind creating P.S. Roaches. It’s ... something that’s been going on ... for a long time [ ] that I just felt like I needed to address. I’m an artist ... I speak real life experience....
Later, at the Disciplinary Committee meeting, Bell likewise explained that the song was an effort to “speak out” on the issue of teacher-on-student sexual harassment.[6]
Although Bell was an enrolled high school student, he was not within the custody of the school system when he initially composed, recorded, and posted his rap song on the Internet during the Christmas holidays. At that time he was eighteen years old but living with his mother, and therefore was an adult capable of making his own decisions as to expressing his views publicly. Even if he had still been a minor at the time he composed and posted his song, he would have been subject to the exclusive control, custody, and discipline of his parent — not the school system. See Shanley v. Ne. Indep. Sch. Dish, 462 F.2d 960, 964 (5th Cir.1972). Because Bell’s speech did not fall within any of the narrow unprotected categories of speech recognized by the Supreme Court (e.g., obscenity or a true threat),[7] it was fully protected speech and presumptively not subject to governmental regulation or censorship on the basis of its content. See Erznoznik v. City of Jacksonville, 422 U.S. 205, 213, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) (“Speech that is neither obscene as to youths nor subject to some other legitimate proscriptions cannot be suppressed solely to protect the young ... ”). Beyond that basic First Amendment protection, however, the content, form, and context of Bell’s speech indisputably reveals that it was also entitled to “special protection” against censorship because it was speech on a matter of public concern safeguarded “at the heart” of the First Amendment’s protections. Snyder, 562 U.S. at 451-52, 131 S.Ct. 1207. Therefore, at a bare minimum, Bell was entitled to as much, if not more, First Amendment protection as tortfeasors and public employees when the state attempts to regulate their speech addressing matters of public concern. See, e.g., Snyder, 562 U.S. at 459-60, 131 S.Ct. 1207 (holding that speakers on matters of *411 public concern could not be held liable in tort for intentional infliction of emotional distress, intrusion upon seclusion, and civil conspiracy on the basis of their speech); United States v. Nat’l Treasury Employees Union, 513 U.S. 454, 466-68, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (explaining the restrictions upon the government to punish employees when they speak on matters of public concern); Rankin, 483 U.S. at 386-89, 107 S.Ct. 2891 (holding that threatening statement by public employee addressed a matter of public concern and government could not terminate her on the basis of that speech). Moreover, while it is not dispositive of this case, it bears mentioning that the School Board has never attempted to argue that Bell’s song stated any fact falsely.
The majority opinion, however, wholly ignores these critical aspects of Bell’s speech,[8] instead reflexively reducing Bell’s rap song to “intimidating, harassing, and threatening” speech without any analysis whatsoever. Indeed, under the majority opinion’s newfound approach, Bell’s off-campus speech is regulable by school officials pursuant to Tinker because (i) Bell wanted his speech to be heard by community members and (ii) “a layperson” apparently would view some of the lyrics in the rap as “threatening,” “harassing,” and “intimidating.” As an initial matter, I am compelled to point out that the majority opinion’s test unabashedly adopts almost the precise wording of the Itawamba County School Board’s disciplinary policy. Unmoored from traditional constitutional law analysis, the majority opinion instead exalts this single school board’s policy to a new rule of constitutional law. See Maj. Op. pp. 395-96 (holding that Tinker applies where student’s off-campus speech is threatening, harassing and intimidating).
Furthermore, Snyder itself squarely illumines the errors in the majority’s two-prong test. Turning first to the majority opinion’s flawed criticism of Bell’s intention to publicize his message, the Supreme Court in Snyder explicitly held that a speaker’s efforts to communicate his message to the public is a reason to provide his speech with heightened protection — not a reason to permit greater regulation by the state. 562 U.S. at 454-55, 131 S.Ct. 1207 (concluding that protesters’ decision to conduct their protest “on public land next to a public street” evinced that the speech addressed a matter of public concern). Yet, in direct contradiction to Snyder, the majority opinion’s proffered framework perversely faults Bell for his efforts to publicize the teachers’ sexual misconduct, thus creating precedent that contravenes the very values that the First Amendment seeks to protect. See Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (“At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern.”).
In addition, contrary to the majority opinion’s focus on how a “layperson” apparently would perceive Bell’s speech, the Supreme Court’s cases, including Snyder, *412 demonstrate that listeners’ subjective opinions about speech cannot control whether speech addresses a matter of public concern or not. For example, in Snyder, the Court explained that “[t]he arguably ‘inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.’ ” 562 U.S. at 453, 131 S.Ct. 1207. (quoting Rankin, 483 U.S. at 387, 107 S.Ct. 2891). Specifically, in Snyder, a layperson likewise might have viewed the anti-gay protesters’ messages as harassing (“God Hates You”), intimidating (‘You’re Going to Hell”), and threatening (“Thank God for Dead Soldiers,” “Thank God for IEDs”), but the Court nevertheless held that “the overall thrust and dominant theme of Westboro’s demonstration spoke to broader public issues” entitling it to “special protection.” Id. at 454, 131 S.Ct. 1207. Thus, the “special protection” that must be afforded to Bell’s speech here cannot be qualified by the majority opinion’s mere conjecture that some hypothetical “layperson” might consider a few of Bell’s lyrics to fit the Oxford English Dictionary’s definition of “threatening,” “harassing” or “intimidating.” See id. Indeed, there is no constitutional basis for excluding “threatening,” “harassing,” or “intimidating” speech from the “special protection” that is afforded speech on matters of public concern. The majority opinion’s approach is thus tantamount to permitting mainstream sensitivities to define whether speech addresses a matter of public concern or not. Snyder clearly demonstrates that approach is flawed. Id. at 453, 131 S.Ct. 1207; see also Cohen v. California, 403 U.S. 15, 21, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (recognizing that the First Amendment does not permit “a majority to silence dissidents simply as a matter of personal predilections”).
In sum, by refusing to recognize that Bell’s speech addresses a matter of public concern and is thereby entitled to “special protection” against censorship, the majority opinion creates a precedent that effectively inoculates school officials against off-campus criticism by students.' In so doing, the majority opinion fails to take seriously the long-established principle that the First Amendment was adopted to protect “vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.” Sullivan, 376 U.S. at 270, 84 S.Ct. 710; cf. City of Houston v. Hill, 482 U.S. 451, 465, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (holding that the First Amendment does not permit states to “provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them”). Contrary to the majority opinion’s position, school officials are no exception. See West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 637, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (“The Fourteenth Amendment ... protects the citizen against the State itself and all of its creatures — Boards of Education not excepted.”); Shanley, 462 F.2d at 964 (“It should have come as a shock to the parents of five high school seniors ... that their elected school board had assumed suzerainty over their children before and after school, off school grounds, and with regard to their children’s rights of expressing their thoughts. We trust that it will come as no shock whatsoever to the school board that their assumption of authority is an unconstitutional usurpation of the First Amendment.”).
II.
The en bane majority opinion affirms the School Board’s punishment of Bell pursuant to its new and unprecedented rule of constitutional law whereby schools may punish students’ off-campus speech pursuant to Tinker if that speech is intentionally directed at the school community and is *413 “threatening, harassing, and intimidating” to the ears of a “layperson” without any instruction on the meaning of these terms. The majority opinion’s content-based, vague, and “layperson”-based restriction directly conflicts with the core principles underlying the First Amendment’s guarantees as explained by the Supreme Court.
A.
“The First Amendment provides that ‘Congress shall make no law ... abridging the freedom of speech.’ ” United States v. Stevens, 559 U.S. 460, 468, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010). As a general matter, the First Amendment prohibits the government from “restricting] expression because of its message, its ideas, its subject matter, or its content.” Ashcroft v. American Civil Liberties Union, 535 U.S. 564, 573, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002). “From 1791 to the present, however, the First Amendment has permitted restrictions upon the content of speech in a few limited areas, and has never included a freedom to disregard these traditional limitations.” Stevens, 559 U.S. at 468, 130 S.Ct. 1577. “These limited areas — such as obscenity, incitement, and fighting words — represent well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any constitutional problem.” Brown v. Entm’t Merchants Ass’n, — U.S. -, 131 S.Ct. 2729, 2733, 180 L.Ed.2d 708 (2011) (internal quotation marks and citations omitted).
In Brown, the Supreme Court specifically rejected the argument that state officials retain a broad “free-floating power” to create whole new categories of unprotected speech that are applicable solely to minors, even if such speech is deemed harmful in the eyes of the government. Id. at 2735-36. In that case, the Court struck down as violative of the First Amendment a California law that prohibited the sale or rental of violent video games to minors. Id. at 2732-33. Specifically, the law proscribed the sale or rental to minors of video “games ‘in which the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being, if those acts are depicted’ in a manner that ‘[a] reasonable person, considering the game as a whole, would find appeals to a deviant or morbid interest of minors,’ that is ‘patently offensive to prevailing standards in the community as to what is suitable for minors,’ and that ‘causes the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors.’” Id. (quoting Cal. Civ.Code Ann. § 1746(d)(1)(A)). California purportedly enacted the law based on its legislative judgment, which it claimed was supported by research, that such games were harmful to children. Id. at 2738-39. In defending the law, California argued, inter alia, that the First Amendment permitted it “to create a wholly new category of content-based regulation that is permitted only for speech directed at children” — viz., “violent” speech as defined above that lacked “serious literary, artistic, political, or scientific value for minors.” Id. at 2733-35.
In a strongly worded opinion by Justice Scalia, the Supreme Court rejected California’s arguments and struck down the law. Concluding that its recent decision in United States v. Stevens, 559 U.S. 460, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010),[9] con *414 trolled the outcome of the case, the Court held that California could not defend its law by analogizing the violent speech at issue to the obscenity exception to the First Amendment because its prior “cases have been clear that the obscenity exception ... does not cover whatever a legislature finds shocking, but only depictions of sexual conduct.” Id. at 2734. More critically, however, the Court outright rejected California’s argument that the First Amendment permitted the state “to create a wholly new category of content-based regulation,” ie., speech containing violent imagery, “that is permissible only for speech directed at children.” Id. at 2735. Although acknowledging that the state “possesses legitimate power to protect children from harm,” the Court concluded that such power “does not include a free-floating power to restrict the ideas to which children may be exposed.” Id. at 2736. Further, while noting that California’s argument would “fare better if there were a longstanding tradition in this country of specially restricting children’s access to depictions of violence,” the Court observed that there was no such tradition, as evidenced by the extent of violence contained in common children’s stories (e.g., Hansel and Gretel) and high school reading lists (e.g., the description in “Lord of the Flies” of a schoolboy who is savagely murdered by other children). Id. at 2736. Accordingly, as in Stevens, because there was no “longstanding tradition” of prohibiting minors’ participation in speech containing violent imagery, the Court refused to hold that such speech is categorically exempted from First Amendment protection. Id. at 2736-38.
Applying these principles to the instant case, Brown represents a forceful reaffirmation by the Court that the First Amendment applies to minors,[10] id. at 2735, and that the government may only restrict that *415 constitutional right in “narrow and well-defined circumstances,” id. at 2736 (citing Erznoznik, 422 U.S. at 212-13, 95 S.Ct. 2268). Indeed, after Brown, it cannot seriously be contested that minors enjoy the First Amendment right to engage in speech containing violent imagery when they are at home, away from school, so long as that speech does not rise to the level of a true threat, incitement or fighting words. See id. at 2736-38 (holding that speech containing violent imagery is protected under the First Amendment, even for minors). Nevertheless, the majority opinion wholly fails to reckon with these important statements by the Court. Instead, by simply assuming that all children speak “qua students,” its legal analysis begins with the false premise that the speech at issue constitutes “student speech” that must be “tempered in the light of a school official’s duty” to teach students appropriate behavior. See Maj. Op. pp. 389-90 (discussing the First Amendment rights of “[sjtudents qua students”). But the Supreme Court has never suggested that minors’ constitutional rights outside of school are somehow qualified if they coincidentally are enrolled in a public school. To the contrary, Brown evinces that the majority opinion instead should have begun its analysis from the basic premise that children are entitled to “significant” First Amendment rights. 131 S.Ct. at 2735-36.
Further, Brown and Stevens illuminate the error in the majority opinion’s decision to proclaim an entirely new, content-based restriction on students’ First Amendment rights. Although acknowledging that the government has certain powers to protect children from harm, the Supreme Court in Brown expressly held that this “does not include a free-floating power to restrict the ideas to which children may be exposed.” 131 S.Ct. at 2736. In so holding, the Court echoed the principles announced in Stevens and rejected the argument that the state is empowered to carve out new “categorical exemptions” to the First Amendment’s protections (e.g., obscenity) that are solely applicable to minors absent a “longstanding tradition” of restricting such speech. Id. In direct contradiction to these principles, however, the majority opinion' here affords state officials with precisely such a “free-floating power” by effectively permitting them to regulate an unprecedented and content-based category of speech, i.e., “threatening,” “harassing,” and “intimidating” speech that is directed at the school community. Yet, the majority opinion cites no “longstanding tradition” in this country of “specially restricting” children’s ability to engage off campus in “threatening,” “harassing,” or “intimidating” speech. Nor could it. See id. (“California’s argument would fare better if there were a longstanding tradition in this country of specially restricting children’s access to depictions of violence, but there is none.”); Stevens, 559 U.S. at 469, 130 S.Ct. 1577 (“But we are unaware of any similar tradition excluding depictions of animal cruelty from ‘the freedom of speech’ codified in the First Amendment, and the Government points us to none.”). To the extent the majority opinion posits this category of speech is without redeeming social value[11] or that its risks outweigh its costs, the Supreme Court has flatly rejected such a rationale for carving out new categories of unprotected speech. See Stevens, 559 U.S. at 470, 130 S.Ct. 1577 (“The First Amendment’s guarantee of free speech does not extend only to *416 categories of speech that survive an ad hoc balancing of relative social costs and benefits.”). In this connection, the Court in Brown likewise held that majoritarian abhorrence for a category of speech (ie., violent speech) will not justify a categorical restriction upon that type of speech. See Brown, 131 S.Ct. at 2733 (“Under our Constitution, esthetic and moral judgments about art and literature ... are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority.” (internal quotation marks and citation omitted)). Moreover, contrary to the majority opinion’s approach, the Supreme Court in both Brown and Stevens emphasized that the “historic and traditional categories” of unprotected speech (e.g., fighting words, obscenity) are “well defined and narrowly limited.” See Brown, 131 S.Ct. at 2733; Stevens, 559 U.S. at 468-69, 130 S.Ct. 1577. Here, far from announcing a “narrow” or “well defined” restriction on speech, the majority opinion simply declares that schools may regulate off-campus student speech that its invented layperson might consider “threatening,” “harassing,” or “intimidating.” As detailed below, the breadth of these content:based restrictions will leave students to speak at their own peril away from school, because school officials will be unconstrained due to the majority opinion’s failure to provide any specific or determinate definition of “threatening,” “harassing,” or “intimidating.”
B.
The Court’s opinion in Reno v. American Civil Liberties Union, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), further reveals the flaws in the majority opinion’s holding that schools may regulate students’ off-campus online speech, like Bell’s. Reno was the first significant First Amendment case specifically pertaining to the Internet to reach the Supreme Court, and concerned a facial challenge to a congressional statute, the Communications Decency Act of 1996 (“CDA”), which was aimed at protecting minors from “indecent” and “patently offensive” material on the Internet by prohibiting the transmission of those materials to minors. 521 U.S. at 858-59, 117 S.Ct. 2329. In striking down the CDA as violative of the First Amendment, the Court articulated a number of principles that are directly pertinent to the instant case.
First, Reno reveals that the majority opinion here is in error in concluding that the advent of the Internet and other technologies necessitates expanding schools’ authority to regulate students’ off-campus speech. See Maj. Op. pp. 392-93. In direct contradiction to the majority opinion’s logic, the Court in Reno held that Supreme Court precedents “provide no basis for qualifying the level of First Amendment scrutiny that should be applied to [the Internet].” Id. at 870, 117 S.Ct. 2329. Although the Court previously had recognized that special factors justify greater regulation of speech expressed in broadcast media, see, e.g., FCC v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), the Court explicitly found that “[t]hose factors are not present in cyberspace.” Reno, 521 U.S. at 868, 117 S.Ct. 2329.[12] Nevertheless, the major *417 ity opinion overlooks these unequivocal statements by the Supreme Court. See, e.g., Maj. Op. p. 392 (concluding that “[t]he advent of [the Internet and other] technologies and their sweeping adoption by students present new and evolving challenges for school administrators, confounding previously delineated boundaries of permissible regulations”).
In addition, the Court’s analysis in Reno reveals how the majority opinion’s ill-devised framework for regulating minors’ off-campus Internet speech would be too vague altogether for the First Amendment to tolerate. The Court in Reno took special issue with the vagueness of the terms that the CDA utilized to describe the proscribed speech. Id. at 871, 117 S.Ct. 2329. For example, the Court emphasized that the statute did not define either “indecent” material or material that “in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs.” Id, As the Court observed, “[g]iven the absence of a definition of either term, this difference in language will provoke uncertainty among speakers about how the two standards relate to each other and just what they mean. Could a speaker confidently assume that a serious discussion about birth control practices, homosexuality, the First Amendment issues raised by the Appendix to our Pacifica opinion, or the consequences of prison rape would not violate the CDA?” Id.
Similar vagueness concerns drove Justice Alito to conclude that the California “violent video game” regulation in Brown violated the Constitution. Brown, 131 S.Ct. at 2743-46 (Alito, J., joined by Roberts, C.J., concurring in the judgment). As Justice Alito observed, one of the elements defining the proscribed violent video games was whether a “reasonable person, considering [a] game as a whole,” would find that it “appeals to a deviant or morbid interest of minors.” Id. at 2745. However, as Justice Alito observed, the “prevalence of violent depictions in children’s literature and entertainment creates numerous opportunities for reasonable people to disagree about which depictions may excite ‘deviant’ or ‘morbid’ impulses.” Id. at 2746.
Here, the en banc majority opinion similarly announces a new, categorical restriction upon students’ off-campus speech that fails to “give people of ordinary intelligence fair notice of what is prohibited.” See id. at 2743. Specifically, the majority opinion holds that school officials may punish students’ off-campus speech when (i) it is intended to be heard by the school community; (ii) could be perceived by a layperson as “threatening,” “harassing,” and “intimidating,”; and (iii) satisfies the Tinker “substantial-disruption” framework. See Maj. Op. pp. 395-96. As with the statute struck down in Reno, however, each one of these three prongs to the majority opinion’s framework contains defects that fail to provide students, like Bell, with adequate notice of when their off-campus speech crosses the critical line between protected and punishable expression. First, the majority opinion’s focus on whether the student “intended” his speech to reach the school community sig- ' nificantly burdens the ability of students to engage in online speech, because virtually any speech on the Internet can reach *418 members of the school community. See Reno, 521 U.S. at 870, 117 S.Ct. 2329 (observing that the Internet permits “any person ... [to] become a town crier with a voice that resonates farther than it could from any soapbox”). How, then, can a student be certain that his off-campus blog posting will not be read by members of the school community and thereby be deemed by school officials to be “intentionally directed] at the school community”? As a result of the ambiguities in the majority opinion’s framework, he simply cannot. See id. (“Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer.”).
Second, the majority opinion’s “threatening, harassing, and intimidating” test suffers from the precise same ambiguities that drove the Court to strike down the CDA in Reno. As with the CDA, the majority opinion fails to provide any meaningful definition of what constitutes “threatening,” “harassing,” or “intimidating” speech. Rather, the majority opinion merely concludes that if a “layperson would understand”[13] speech to qualify as “threatening,” “harassing,” and “intimidating,” then that speech is regulable under Tinker. In so holding, the majority opinion fails to apprehend that reasonable minds may differ about when speech qualifies as “threatening,” “harassing,” or “intimidating.” As the Supreme Court’s First Amendment precedents make clear, “it is ... often true that one man’s vulgarity is another’s lyric,” Cohen v. California, 403 U.S. 15, 25, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), and that the very same words may simultaneously be perceived as repulsive to some and political to others, see Snyder, 562 U.S. at 444-45, 131 S.Ct. 1207 (“Westboro may have chosen the picket location to increase publicity for its views, and its speech may have been particularly hurtful to Snyder. That does not mean that its speech should be afforded less than full First Amendment protection under the circumstances of this case.”). Thus, “[g]iven the vague contours of the coverage of the [majority opinion’s framework], it [will] unquestionably silence[] some speakers whose messages would be entitled to constitutional protection.” Reno, 521 U.S. at 874, 117 S.Ct. 2329.
Third, the aforementioned concerns are exacerbated by the fact that the Tinker standard itself could be viewed as somewhat vague.[14] Tinker permits schools to regulate on-campus expressive activities not only when the speech, in fact, causes a substantial disruption, but also when school officials can “reasonably forecast” such a disruption, Tinker, 393 U.S. at 514, 89 S.Ct. 733. If this standard were ap *419 plied off campus, how can a student or a student’s parents know with any degree of certainty when off-campus online speech can be “forecasted” to cause a “substantial disruption”? Although Tinker is not a completely toothless standard, see A.M. ex rel. McAllum v. Cash, 585 F.3d 214, 221 (5th Cir.2009), its framework inherently requires guesswork about how a third-party school official will prophesize over the effect of speech. Thus, in light of the majority opinion, before a student drafts an email or writes a blog entry, he hereinafter will be required to conjecture over whether his online speech might cause a “disruption” that is “substantial” in the eyes of school officials, or, alternatively, whether a school official might reasonably portend that a substantial disruption might happen. In' this way, the majority opinion erroneously defines the contours of protected speech with reference to the potential reactions of listeners. See Beckerman v. City of Tupelo, 664 F.2d 502, 509 (5th Cir.1981) (observing that the Supreme Court’s cases concerning the “hecklers’ veto” show that it “is not acceptable for the state to prevent a speaker from exercising his constitutional rights because of the reaction to him by others”).
What will be the direct consequence of these various layers of vagueness upon students’ First Amendment freedoms? “[I]t will operate[ ] to chill or suppress the exercise of those freedoms by reason of vague terms or overbroad coverage.” See Nevada Comm’n on Ethics v. Carrigan, - U.S. -, 131 S.Ct. 2343, 2353, 180 L.Ed.2d 150 (2011) (Kennedy, J. concurring). Indeed, for students, whose performance at school largely determines their fate in the future, even the specter of punishment will likely deter them from engaging in off-campus expression that could be deemed controversial or hurtful to school officials. Accord Reno, 521 U.S. at 871-72, 117 S.Ct. 2329 (“The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech.”). Such a burden on student’s expressive activities simply cannot be reconciled with the long-established principle that “the point of all speech protection ... is to shield [from censorship] just those choices of content that in someone’s eyes are misguided, or even hurtful.” Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557, 574, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995).
C.
Further, by adopting a rule that focuses on whether a “layperson” would perceive Bell’s speech as “threatening,” “harassing,” and “intimidating,” the majority opinion also ignores Supreme Court case law that demands a more burdensome showing upon the government before levying penalties upon a speaker based on the content of his speech.
Amongst the most consistent principles of First Amendment jurisprudence has been the need for “[e]xacting proof requirements” before imposing liability for speech. See Illinois ex rel. Madigan v. Telemarketing Associates, Inc., 538 U.S. 600, 620, 123 S.Ct. 1829, 155 L.Ed.2d 793 (2003). For example, the Supreme Court has explicitly rejected arguments permitting tort liability to be imposed for speech pertaining to public figures simply because it “is patently offensive and is intended to inflict emotional injury.” Falwell, 485 U.S. at 50, 108 S.Ct.. 876. Rather, in order to “give adequate ‘breathing space’ to the freedoms protected by the First Amendment,” the Court has held that a public figure must prove not only falsity but also actual malice. Id. at 56, 108 S.Ct. 876. Similarly, in the criminal context, “mens rea requirements ... provide ‘breathing *420 room’ for more valuable speech by reducing an honest speaker’s fear that he may accidentally incur liability for speaking.” United States v. Alvarez, — U.S. -, 132 S.Ct. 2537, 2553, 183 L.Ed.2d 574 (2012) (Breyer, J., concurring, in the judgment). Thus, in Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), the Supreme Court reversed the conviction of a Ku Klux Klan leader for threatening “revengeance” if the “suppression” of the white race continued, relying on “the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.” Id. at 447, 89 S.Ct. 1827 (emphasis added); see also Noto v. United States, 367 U.S. 290, 297-98, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961) (“[T]he mere abstract teaching of ... the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action.”). Subsequently, the Court applied Brandenburg ’s focus on the “intent” of the speaker to hold that a speaker may not be held liable for damages in a civil case even when his remarks “might have been understood ... as intending to create a fear of violence.” N.A.A.C.P. v. Claiborne Hardware Co., 458 U.S. 886, 904, 927, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982) (emphasis added).
Applying these well-established First Amendment principles, the Supreme Court in Virginia v. Black, 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003), struck down a Virginia statute that criminalized burning a cross in public “with the intent of intimidating any person,” and which provided that the public burning of a cross “shall be prima facie evidence of an intent to intimidate.” . Id. at 347-48, 123 S.Ct. 1536. Although cross burning is “widely viewed as a signal of impending terror,” id. at 391, 123 S.Ct. 1536 (Thomas, J., concurring), “in light of [its] long and pernicious history as a signal of impending violence,” id. at 363, 123 S.Ct. 1536 (opinion of O’Connor, J.), a plurality of the Court held that a subjective intent requirement was necessary in order to distinguish “constitutionally proscribable intimidation” from “core political speech,” id. at 365-66, 123 S.Ct. 1536. “Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.” Id. at 360, 123 S.Ct. 1536 (emphasis added). As the plurality explained, the prima facie evidence provision of the statute was facially unconstitutional because it “ignore[d] all the contextual factors that are necessary to decide whether a particular cross burning was intended to intimidate. The First Amendment does not permit such a short cut.” Id. at 367, 123 S.Ct. 1536. In other words, the prima facie evidence provision “strip[ped] away the very reason a state may ban cross burning with the intent to intimidate.” Id. at 365, 123 S.Ct. 1536.
Recently, in Elonis v. United States, — U.S. -, 135 S.Ct. 2001, 192 L.Ed.2d 1 (2015), the Supreme Court was presented with the opportunity to revisit its reasoning in Virginia v. Black and clarify whether or not the First Amendment requires a speaker to have a “subjective intent” to threaten an individual before the government can impose criminal penalties for a threat. Id. at 2004 (“The question is whether [18 U.S.C. § 875(c) ] ... requires that the defendant be aware of the threatening nature of the communication, and — if not — whether the First Amendment re *421 quires such a showing.”). The Court, however, avoided this constitutional question by deciding the case on narrower grounds, viz., that a jury instruction explaining that petitioner could be convicted upon a showing of negligence was inconsistent with the statute’s implicit mens rea requirement. Id. at 2012 (“The jury was instructed that the Government need only prove that a reasonable person would regard Elonis’s communications as threats, and that was error.... Given our disposition, it is not necessary to consider any First Amendment issues.”). Specifically, the Court outright rejected the government’s contention that the statute permitted petitioner to be convicted if he (i) knew the “contents and context” of his speech and (ii) “a reasonable person would have recognized that the [speech] would be read as genuine threats.” Id. at 2011. While recognizing that such a “ ‘reasonable person’ standard is a familiar feature of civil liability in tort law,” the Court concluded that the standard is “inconsistent with the conventional requirement for criminal conduct — awareness of some wrong doing.” Id. (internal quotation marks omitted).
Applying the 'foregoing' principles to the instant ease, the majority opinion errs by making the scope of Bell’s First Amendment rights outside of school contingent upon whether a “layperson” might interpret his speech to be “threatening,” “harassing,” and “intimidating,” see Maj. Op. pp. 396-97, and whether a school official might “reasonably” forecast a substantial disruption based on his speech, see Maj. Op. pp. 398-99. The majority opinion’s test effectively amounts to the very kind of negligence standard that the Supreme Court has rejected for determining whether a speaker may be held liable on the basis of his words. See, e.g., Claiborne Hardware Co., 458 U.S. at 928-29, 102 S.Ct. 3409; Brandenburg, 395 U.S. at 447, 89 S.Ct. 1827. Further, by permitting Bell to be punished solely on the basis that a third-party might consider his speech “intimidating” or “threatening,” the majority opinion ignores the Court’s explanation in Black that “[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.” 538 U.S. at 360, 123 S.Ct. 1536 (emphasis added). Instead, perhaps conceding sub silentio that Bell’s speech does not satisfy the demanding “true threat” standard described in Black, the majority opinion circumvents this issue altogether by creating an entirely new and diluted' test that renders . speech unprotected so long as its invented layperson might view the speech as “intimidating,” “harassing,” and “threatening,” despite the fact that such speech does not constitute a “true threat.” See Bell v. Itawamba Cnty. Sch. Bd., 774 F.3d 280, 300-03 (5th Cir.2014) (explaining that Bell’s song did not constitute a “true threat,” “as evidenced by, inter alia, its public broadcast as a rap song, its conditional nature, and the reactions of its listeners”). Moreover, the majority opinion’s approach is especially problematic in light of the critical fact that Bell’s speech addresses a matter of public concern. In cases involving speech addressing public figures and matters of public import, the Court has consistently applied a stricter evidentiary burden before permitting liability to be imposed on a speaker on the basis of his speech. See, e.g., Falwell, 485 U.S. at 56, 108 S.Ct. 876 (holding that “public figures and public officials” must prove “actual malice” in addition to falsity before recovering for intentional infliction of emotional distress on the basis of speech directed at them); Sullivan, 376 U.S. at 279-80, 84 S.Ct. 710 (holding that the First Amendment “prohibits a public official *422 from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with ‘actual malice’ ”). Here, in sharp contrast, the majority opinion announces a constitutional rule whereby students, like Bell, may be held liable for their off-campus speech that criticizes official misconduct based largely on the reactions of the very officials in question or the perception of the majority opinion’s invented “layperson.” Such a .flimsy standard simply cannot be squared with the foregoing First Amendment precedents. See also Pacifica Foundation, 438 U.S. at 745-46, 98 S.Ct. 3026 (“[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is .the speaker’s opinion that gives offense, that consequence is a reason for according it constitutional protection.”).
III.
In ultimately holding that the Tinker framework applies to off-campus speech like Bell’s, the majority opinion ignores that Tinker’s holding and its sui generis “substantial-disruption” framework are expressly grounded in “the special characteristics of the school environment.” Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In Tinker, the Court confronted the question whether school officials may, consistent with the First Amendment, restrict students’ expressive activities that occur at school. Id. Specifically, the students in Tinker were suspended for wearing to school armbands that expressed their opposition to the Vietnam .War. Id. at 504, 89 S.Ct. 733. While recognizing that students do not “shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,” id. at 506, 89 S.Ct. 733, the Court also observed that students’ exercise of their First Amendment rights at school must be calibrated against the competing need of school officials “to prescribe and control conduct in the schools,” id. at 507, 89 S.Ct. 733 (emphasis added). To reconcile the interests at stake that may collide when student speech occurs on campus, the Court articulated a rule that has become the lodestar for evaluating the scope of students’ on-campus First Amendment rights ever since: while on campus, a student is free to “express his opinions, even on controversial subjects, if he does so without ‘materially and substantially interfering) with the requirements of appropriate discipline in the operation of the school’ and without colliding with the rights of others.” Id. at 513, 89 S.Ct. 733 (quoting Burnside v. Byars, 363 F.2d 744, 749 (5th Cir.1966)).
The Supreme Court’s holding in Tinker is expressly based upon the “special characteristics of the school environment,” id. at 506, 89 S.Ct. 733, and the need to defer to school officials’ authority “to prescribe and control conduct in the schools,” id. at 507, 89 S.Ct. 733. Indeed, the very analytic content of the resulting “substantial-disruption” framework evinces that the Court was solely concerned with the potentially disruptive consequences of speech by students that occurs on campus, where school officials and fellow students may be directly affected. See, e.g., id. at 514, 89 S.Ct. 733 (“[The students] neither interrupted school activities nor sought to intrude in the school affairs or the lives of others. They caused discussion outside of the classrooms, but no interference with work and no disorder.”). Moreover, the Court’s later school-speech cases emphasize that the Tinker framework is limited to speech occurring within the school environment. For example, according to the Court’s decision in Bethel School District No. 403 v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), Tinker rests on the premise that “the constitutional *423 rights of students in public schools are not automatically coextensive with the rights of adults in other settings.” Id. at 682,106 S.Ct. 3159 (emphasis added); see also id. at 688 n. 1, 106 S.Ct. 3159 (Brennan J., concurring in judgment) (stating that the Court’s student-speech precedents “obviously do not [apply] outside of the school environment” and also observing that if the plaintiff in Fraser “had given the speech [for which he was punished] outside of the school environment, he could not have been penalized simply because [school] officials considered his language to be inappropriate”). Subsequently, in Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Court described its decision in Tinker as “addressing] educators’ ability to silence a student’s personal expression that happens to occur on the school premises.'” Id. at 271, 108 S.Ct. 562 (emphasis added); see also id. at 266, 108 S.Ct. 562 (observing that schools may regulate some on-campus speech “even though the government could not censor similar speech outside the school”).
Most recently, in Morse, Justice Alito’s controlling concurrence observed that Tinker allows school officials to regulate “in-school student speech ... in a way that would not be constitutional in other settings.” 551 U.S. at 422, 127 S.Ct. 2618 (Alito, J. concurring). Justice Alito further emphasized the historically significant distinction between on-campus and off-campus expression by comparing the unique harms of speech that occurs within the schoolyard as opposed to outside of school: “School attendance can expose students to threats to their physical safety that they would not otherwise face. Outside of school, parents can attempt to protect their children in many ways and may take steps to monitor and exercise control over the persons with whom their children associate.” Id. at 424, 127 S.Ct. 2618 (Ali-to, J. concurring). In this regard, Justice Alito also rejected the contention that school officials “stand in the shoes of the students’ parents,” explaining that “[i]t is a dangerous fiction to pretend that parents simply delegate their authority — including their authority to determine what then-children may say and hear — to public school authorities.” Id. Further, Justice Alito observed that he joined the majority opinion on the understanding that the Court’s holding does not justify “any other speech restriction” based on the “special characteristics” of the school environment beyond those already recognized in the Court’s prior student-speech cases. Id. at 423, 127 S.Ct. 2618. Indeed, in narrowly limiting the reach of the Court’s holding, Justice Alito characterized school officials’ regulation of the student-speech at issue in that case[15] as “standing at the far reaches of what the First Amendment permits.” Id. at 425, 127 S.Ct. 2618. As the foregoing demonstrates, Morse and the Court’s other post-Tinker precedents make crystal clear what the majority opinion and some *424 of our sister circuits’ decisions[16] fail to follow: Tinker does not authorize school officials to regulate student speech that occurs off campus and not at a school-sponsored event, where the potential “collision” of interest upon which Tinker’s holding pivots simply is not present.
Further, even assuming arguendo, without deciding, schools possess some authority to regulate students’ off-campus speech under certain circumstances, the majority opinion errs in deeming the Tinker framework as the appropriate standard to delineate the scope of that authority. In reaching this conclusion, the majority opinion’s logic is flawed from the very start. The majority opinion oddly begins its analysis by citing our opinion in Morgan v. Swanson, 659 F.3d 359 (5th Cir.2011) (en banc), for the proposition that the threshold task facing the en banc court is “categorizing the student speech at issue.” Id. at 375. Without ever mentioning that Morgan was a case involving qualified immunity for school officials’ suppression of on-campus speech,[17] the majority opinion then proceeds to determine whether it should-evaluate Bell’s claim under the Tinker framework or under one of the other categorical exemptions' for student speech that the Supreme Court or this court has recognized. See Maj. Op. pp. 391-92. Then, after determining that the School Board here did not punish Bell because his speech was lewd (Fraser) or school-sponsored (Hazelwood) or threatened a Columbine-style mass shooting (Ponce),- the majority opinion summarily concludes via process-of-elimination that the Tinker framework must be the appropriate framework for evaluating whether Bell’s speech is protected or not. See Maj. Op. p. 392 (‘We therefore analyze Bell’s speech under Tinker.”). But the majority opinion suspiciously neglects to note that not a single one of these precedents has ever been applied by the Supreme Court or our Circuit[18] to regulate a student’s off-campus *425 Internet speech, like Bell’s. Nevertheless, the majority opinion simply assumes that those precedents apply under these circumstances without first conducting any meaningful analysis to justify its logic. In other words, by comparing apples to oranges, the majority opinion puts the proverbial cart before the horse. Indeed, as explained above, the Tinker standard was invented, in part, to counteract the consequences of speech that actually occurs within the school environment and to take account of school officials’ competing interest to “control conduct in the schools.” See Tinker, 393 U.S. at 507, 89 S.Ct. 733. Specifically, in Tinker, the competing state interest was in avoiding the disruptive consequences of speech that occurs within school. See id. Accordingly, the Supreme Court crafted a specific level of scrutiny (the “substantial-disruption” test) to evaluate restrictions on speech within school that strikes a balance between the competing interests at stake. Even assuming arguendo schools had some authority to punish students’ off-campus speech, it is therefore simply a non sequitwr for the majority opinion to reflexively assume that the same analysis should regulate the scope of schools’ authority to punish students’ expression off campus, where the consequences of the speech in question and the constitutional interests at stake are simply not the same as in Tinker.
The majority opinion’s flawed logic in this regard stems naturally from a more fundamental error: the majority opinion fails to take seriously the significance of the various constitutional interests that are implicated by its decision to expand Tinker ’s reach. As detailed above, the particular facts of this case principally concern the First Amendment right of students to speak out on “matters of public concern” when they are away from school by utilizing the unrivaled power of the Internet to make those messages heard. But narrowly focusing on this issue alone ignores the constellation of other constitutional interests that the majority opinion will negatively impact. For example, even when their off-campus expression does not have a “political” or “religious” dimension, children still maintain “significant” First Amendment rights, Brown, 131 S.Ct. at 2735-36, which indisputably include a right to express disrespect or disdain for their teachers when they are off campus. See *426 Kime v. United States, 459 U.S. 949, 951, 103 S.Ct. 266, 74 L.Ed.2d 207 (1982) (“[T]he First Amendment does not permit a legislature to require a person to show his respect for the flag by saluting it. The same constitutional principle applies when the legislature, instead of compelling respect for the flag, forbids disrespect.”). Further, for purposes of the First Amendment, it is simply irrelevant whether prevailing social mores deem a child’s disrespect for his teacher to be contemptible. “The history of the law of free expression is one of vindication in cases involving speech that many citizens may find shabby, offensive, or even ugly.” See United States v. Playboy Entertainment Grp., 529 U.S. 803, 826, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000).
Moreover, the majority opinion’s extension of Tinker to off-campus speech additionally burdens the long-established constitutional interest of parents in the rearing of their children. The Supreme Court has “consistently recognized that the parents’ claim to authority in their own household to direct the rearing of their children is basic in the structure of our society.” Ginsberg v. New York, 390 U.S. 629, 639, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); see also, e.g., Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (observing that “the interest of parents in the care, custody, and control of their children ... is perhaps the oldest of the fundamental liberty interests recognized by the Court”); Pierce v. Soc’y of Sisters, 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (“The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.”). This fundamental right of parents indisputably includes the right to inculcate their children with ideologies and values that the state or mainstream society may consider repugnant. See, e.g., Meyer v. Nebraska, 262 U.S. 390, 403, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (holding that a war-era law banning teaching of German language violated parents’ substantive due process rights); accord Morse, 551 U.S. at 424, 127 S.Ct. 2618 (Alito, J., concurring) (observing that “[i]t is a dangerous fiction to pretend that parents simply delegate their authority — including their authority to determine what their children may say and hear — to public school authorities”). The majority opinion’s extension of the Tinker framework will inevitably frustrate this constitutional right, because school officials will hereinafter be empowered to supplant parents’ control over their children’s off-campus speech that is critical of their teachers.
In addition, authorizing schools to regulate students’ off-campus speech likewise burdens the constitutional interest of fellow citizens in hearing students’ off-campus speech. Courts have long recognized that the First Amendment protects not only the right to speak but also the right to receive speech from others. See, e.g., First Nat’l Bank of Bos. v. Bellotti, 435 U.S. 765, 783, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (stating that the “First Amendment ... afford[s] public access to discussion, debate, and the dissemination of information and ideas”); Martin v. City of Struthers, 319 U.S. 141, 143, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) (explaining that the First Amendment “embraces the right to distribute literature ... and necessarily protects the right to receive it”); Rossignol v. Voorhaar, 316 F.3d 516, 522 (4th Cir.2003) (“The First Amendment ... protects both a speaker’s right to communicate information and ideas to a broad audience and the intended recipients’ right to receive that information and those ideas.” *427 (emphasis in original)). The facts of the instant case poignantly illustrate how the suppression of students’ off-campus speech will burden the First Amendment right of other citizens to receive that speech. As detailed above, Bell authored and publicized his rap song in an effort to raise awareness of a crucial issue to members of his community, viz., the sexual harassment of female students by male school officials. Receiving this information would be critically important to community members, particularly parents of female students at Itawamba, in order to ensure that such conduct ceased and did not recur.[19] Nevertheless, by endorsing the School Board’s punishment of Bell, the majority’s opinion will empower school officials to censor other students’ efforts to inform fellow citizens of information that they have the right — and the urgent need — to receive. Cf. Lamont v. Postmaster General, 381 U.S. 301, 308, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (Brennan, J. concurring) (“The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.”).
Exacerbating the violence committed against these constitutional interests is the unprecedented amount of deference that the majority opinion affords school boards in disciplining off-campus speech pursuant to Tinker. Again, Maj. Op. pp. 396-97, and again, Maj. Op. p. 397, and again, Maj. Op. pp. 397-98, the majority opinion emphasizes the extent of “deference” that, in its view, courts are required to provide school board disciplinary decisions under Tinker. Contrary to the majority opinion’s approach, however, we do not “defer” to schools in interpreting and applying the Constitution. “The authority possessed by the State to prescribe and enforce standards of conduct in its schools, although concededly very broad, must be exercised consistently with constitutional safeguards.” Goss v. Lopez, 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Further, while it is true that Tinker “is not a difficult burden,” Cash, 585 F.3d at 222 (internal quotation marks omitted), this is the very reason that we must not apply Tinker to off-campus speech, like Bell’s. Otherwise, armed with the comfort that courts will simply defer to their decisions, schools will largely have carte blanche to regulate students’ off-campus speech, thus significantly burdening not only the First Amendment rights of students but also the constitutional rights of their parents and their listeners.
IV.
As explained above, the Supreme Court has not decided whether, or, if so, under what circumstances, a public school may regulate students’ online, off-campus speech, and it is not necessary or appropriate for the majority opinion to anticipate such a decision here. That is because, even if Tinker were applicable to the instant case, the evidence does not support the conclusion, as would be required by Tinker, that Bell’s Internet-posted song substantially disrupted the school’s work and discipline or that the school officials reasonably could have forecasted that it would do so.
In considering the School Board’s motion for summary judgment, we are required to view the evidence in the light most favorable to Bell, the non-movant. *428 See Tolan v. Cotton, — U.S. -, 134 S.Ct. 1861, 1868, 188 L.Ed.2d 895 (2014) (per curiam). The majority opinion, however, wholly disclaims this duty by ignoring material facts and refusing to draw inferences in Bell’s favor — particularly those facts and inferences clearly evincing that Bell’s song was not and could not be regarded as a threat. For example, Bell has been an aspiring musician since he was a young boy. He began writing lyrics as a child and started to pursue a musical career in earnest while in his teens. Like many musical artists, Bell has a stage name, “T-Bizzle,” and he regularly[20] records music in a professional studio. Indeed, the very rap that gave rise to this case was recorded at a recording studio off campus called “Get Real Entertainment” records. As he explained to the Disciplinary Committee, Bell considers himself “an artist,” and, as explained above, he originally composed and publicized the song in an effort to “speak out” on and raise awareness of an important issue in his community, ie., sexual harassment of students. Moreover, consistent with his musical aspirations, Bell explained that the version of the song posted to YouTube was also intended to attract the attention of record labels. Further, the screenshot of Bell’s Facebook page reveals that his friends who commented on the song viewed it as the product of Bell’s musical talent as a rap musician rather than a threat of violence (e.g., “Hey, don’t forget me when you’re famous” and “Lol ... been tellin you since we was little ... you got all the talent in the world ...”). In addition, no one — neither Wildmon, Rainey, nor any other teacher or school official — testified that s/he thought Bell, himself, subjectively intended to cause anyone to fear that Bell personally would harm any person. Nor was there any evidence that Bell was a dangerous person or that he had ever engaged in violent or unlawful conduct. Although Bell in his rap song referred to a firearm, the evidence does not reflect that Bell had ever owned, possessed, or had any actual experience with firearms. Except for a single tardiness, Bell had an unblemished school conduct record. These crucial facts not only impeach the School Board’s contention that Bell’s song could reasonably be perceived as a legitimate threat of violence, but also illuminate the fallacies in the majority opinion’s comparison between this case and other circuit decisions that have condoned punishment for intentionally violent student speech.[21]
*429 Moreover, the majority opinion likewise either ignores or glosses over other relevant evidence tending to show that school officials did not consider Bell’s song threatening but instead punished him merely because they did not like the content of his speech. For example, during the closing remarks of the Disciplinary Committee meeting, one member of the committee provided the following admonition to Bell:
I would say censor your material.... Because you are good [at rapping], but everybody doesn’t really listen to that kind of stuff. So, if you want to get [ ] your message out to everybody, make it where everybody will listen to it.... You know what I’m saying? Censor that stuff. Don’t put all those bad words in it.... The bad words ain’t making it better ... Sometimes you can make emotions with big words, not bad words. You know what I’m saying? ... Big words, not bad words. Think about that when you write your next piece.
The school’s censorial focus on the “bad words” in Bell’s song can also be gleaned from the transcript of the preliminary-injunction hearing:
School Board Lawyer: You realized what you had done in publishing this song, while it may be, in your perception, an artistic endeavor, was filthy; and it was filled with words like fuck, correct?
Bell: Yes, sir.
Further, although the majority opinion emphasizes Wildmon’s testimony that Bell’s rap song allegedly scared him, the majority opinion refuses to acknowledge that Rainey testified that he viewed the song as “just a rap” and that “if [he] let it go, it will probably just die down.” In addition to ignoring these material facts, the majority opinion likewise refuses to draw obvious inferences from the record which further evince the fact that school officials did not consider Bell’s song to be threatening in nature. For example, in sharp contrast to other cases in which courts have upheld discipline for a student’s purportedly “violent” speech,[22] nothing in the record reflects that school officials ever contacted law enforcement about Bell’s song. To the contrary, Bell’s principal drove him home that day, and he thereafter was allowed to return to classes. Later, when Bell was suspended pending the outcome of the Disciplinary Committee hearing, he nevertheless was allowed to remain unattended in the school commons for the remainder of the day. These are simply not the actions of school officials who seriously or reasonably believe a student poses a threat of violence to school officials.
Had the majority opinion properly reviewed all the relevant facts and drawn the clear inferences therefrom, it would have been compelled to conclude that the evidence here does not support a finding, as would be required by Tinker, that a “substantial disruption” occurred or that school officials reasonably could have “forecast” a substantial disruption as a result of Bell’s rap. 393 U.S. at 514, 89 S.Ct. 733. As an initial matter, the evidence plainly shows that there was no commotion, boisterous *430 conduct, interruption of classes, or any lack of order, discipline and decorum at the school, as a result of Bell’s posting of his song on the Internet. Cf Shanley, 462 F.2d at 970 (“Disruption in fact is an important element for evaluating the reasonableness of a regulation screening or punishing student expression.”). In fact, at the preliminary injunction hearing, Wildmon explained that his students “seem[ed] to act normal” after Bell’s rap was released, and Rainey testified that most of the talk amongst students had not been about Bell’s song but rather about his suspension and transfer to alternative school. Aside from the single instance when Wildmon requested a student play the song for him, there was no evidence that any student played the song at school. Indeed, school computers blocked Face-book, and cellphones were prohibited, which decreased the likelihood that students could access the song on campus. Further, Bell testified that he never encouraged students or staff to listen to the song at school, and there is no evidence to the contrary. Tellingly, when asked if she could point to any disruption at the school as a result of Bell’s song, the superintendent referred only to the fact that the coaches said that they had altered their “teaching styles” in order to avoid any appearance of initiating or engaging in sexual relationships or harassment with female students.[23] Yet, neither the superintendent nor the coaches described how this alleged change in “teaching styles” had substantially harmed their ability to teach their assigned courses. And, in any event, it is self-evident that a teacher’s effort to avoid the appearance that he is engaging in sexual relationships with students should be deemed a dictate of the classroom and not a disruption of it.[24] In sum, even assuming arguendo that Tinker could be applied to Bell’s speech in this case, the School Board failed to satisfy its burden under the “substantial-disruption” framework.
In reaching the opposite conclusion, however, the majority opinion reasons that Bell’s “threatening, intimidating, and harassing language ... could be forecast by [school officials] to cause a substantial disruption.” See Maj. Op. p. 398. But, the “evidence” that the majority opinion cites for this conclusion is, at the very best, sorely lacking. For example, the majority opinion emphasizes that Wildmon and some unnamed “third parties”[25] purportedly perceived Bell’s rap song as threatening. See Maj. Op. p. 398. Yet, the majority opinion fails to apprehend that an individual’s perception of speech is not necessarily tantamount to a rational assessment of that speech nor a valid basis for concluding that such speech is “unprotected” under the First Amendment. Indeed, regardless of how some individuals might view Bell’s speech, no reasonable listener could perceive Bell’s lyrics as *431 threats in light of the particular context; nor did the particular listeners here. See United States v. Jeffries, 692 F.3d 473, 480 (6th Cir.2012) (“A reasonable listener understands that a gangster growling ‘I’d like to sew your mouth shut’ to a recalcitrant debtor carries a different connotation from the impression left when a candidate uses those same words during a political debate. And a reasonable listener knows that the words ‘I’ll tear your head off mean something different when uttered by a professional football player from when uttered by a serial killer.”). Critically, the speech at issue in this case occurred in a rap song, a musical genre in which hyperbolic and violent language is commonly used in order to convey emotion and meaning — not to make real threats of violence. See, e.g., Andrea L. Dennis, Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence, 31 Colum. J.L. and Arts. 1, 22 (2007). Further, as detailed above, Bell is a long-aspiring rapper; he composed the song in a professional studio; and he publically broadcast the song to raise public awareness and to attract the attention of record labels. These crucial contextual facts reveal that Bell’s song was just that: a song, authored by a young and aspiring musical artist — not the calling card of a would-be killer. The majority opinion therefore errs by relying upon unsubstantiated and unreasonable beliefs that Bell’s song was “threatening” in order to support its conclusion that the School Board satisfied its burden under Tinker. Accord Cash, 585 F.3d at 221-22 (observing that school “[ojfficials must base their decisions on fact, not intuition”) (internal quotation marks omitted).
For additional support that Tinker is satisfied, the majority opinion also emphasizes the wording of the School Board’s Discipline-Administrative Policy. See Maj. Op. p. 398. Specifically, the majority opinion derives meaning from the parallels between Tinker’s “substantial disruption” framework and the School Board’s decision to place the heading “SEVERE DISRUPTIONS ” above twenty-one different disciplinary “offenses,” one of which is the school’s prohibition on “[hjarassment, intimidation, or threatening other students and/or teachers.” Under the policy, other “severe disruptions” include, inter alia, “stealing,” “cutting classes,” and “profanity, or vulgarity (to include acts, gestures, or symbols directed at another person.)” According to the majority opinion, this “policy demonstrates an awareness of Tinker’s substantial-disruption standard,[26] and the policy’s violation can be used as evidence supporting the reasonable forecast of a future substantial disruption.” The majority opinion’s reasoning in this regard is flawed. As an initial matter, this policy nowhere states that it applies to student conduct or speech that, like Bell’s, occurs away from school or school-related activities. In this respect, the policy is facially distinguishable from those on-campus policies in Morse and Fraser to which the majority opinion analogizes. Moreover, however, the majority opinion’s logic is entirely circular. The very task before our court is determining whether the School Board’s decision to discipline Bell under a school policy comported with constitutional dictates. According to the majority opinion, however, the School’s Board’s decision to discipline Bell under a school policy is evidence that the punishment comported with constitutional dictates. Contrary to the majority opinion’s assertions otherwise, this is prototypical ipse dixit.
*432 V.
“[A] ‘function’ of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.” Cox v. Louisiana, 379 U.S. 536, 551-52, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). By raising awareness of high school athletic coaches’ sexual misconduct toward minor female students, Taylor Bell’s rap song had this exact effect, and amongst those most “stir[red] to anger” were Itawamba school officials. The First Amendment prohibited Itawamba from expressing that anger by punishing Bell for the content of his speech. See Barnette, 319 U.S. at 637, 63 S.Ct. 1178 (“The Fourteenth Amendment ... protects the citizen against the State itself and all of its creatures — Boards of Education not excepted.”). “If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.” Texas v. Johnson, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). Indeed, “the point of all speech protection ... is to shield just those choices of content that in someone’s eyes are misguided, or even hurtful.” Hurley, 515 U.S. at 574, 115 S.Ct. 2338. The majority opinion, however, forsakes its duty to uphold this most elementary and important of our Constitution’s guarantees.
In its conclusion, the majority opinion observes that the “mission” of schools is “to educate.” Maj. Op. p. 399. Yet, the majority opinion fails to apprehend the breadth of what an “education” encompasses. As the Supreme Court has explained, “[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.” Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). Teachers are “charge[d] ... with the task of [ijmbuing their students with an understanding of our system of democracy.” New Jersey v. T.L.O., 469 U.S. 325, 354, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (Brennan, J., concurring in part and dissenting in part). “That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government' as mere platitudes.” Barnette, 319 U.S. at 637, 63 S.Ct. 1178. “[Education prepares individuals to be self-reliant and self-sufficient participants in society.” Wisconsin v. Yoder, 406 U.S. 205, 221, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Accordingly, “students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.” Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957).
Viewed in the light of these longstanding principles, Bell’s song was not a disruption of school activities but rather was an effort to participate as a citizen in our unique constitutional democracy by raising awareness of a serious matter of public concern. Yet, rather than commending Bell’s efforts, the Itawamba County School Board punished him for the content of his speech, in effect teaching Bell that the First Amendment does not protect students who challenge those in power. The majority opinion teaches that same mistaken lesson to all the children in our Circuit. Indeed, in concluding that the First Amendment officially condones Bell’s censoring and punishment by the School Board, instead of safeguarding his freedom of speech, the majority opinion undermines the rights of all students and adults to both speak and *433 receive speech on matters of public concern through the Internet.
For these reasons, I respectfully and earnestly dissent.

. “The funeral procession passed within 200 to 300 feet of the picket site. Although Snyder testified that he could see the tops of the picket signs as he drove to the funeral, he did not see what was written on the signs until later that night, while watching a news broadcast covering the event.” Id. at 449, 131 S.Ct. 1207.

. Bell’s Facebook page labels the song "P.S. Koaches,” but Bell's complaint identifies the song's title as "PSK The Truth Needs to be Told.”

.Notably, the instances of sexual misconduct detailed in Bell’s lyrics were not unsubstantiated. Four different female students submitted sworn affidavits detailing the sexual harassment they endured at the hands of the coaches. For instance, consistent with Bell’s lyrics, one female student stated in her sworn affidavit that Rainey had rubbed her ears without her permission. Likewise, another female student claimed that Wildmon had looked down her shirt; told her that she "was one of the cutest black female students” at Itawamba; commented on her "big butt”; and told her that he "would date her if [she] were older.” Another female student consistently stated that Rainey told her, “Damn, baby, you are sexy,” while in the school gym. Another female student stated that Rainey told her that he would “turn” her "back straight from being gay.”

. See, e.g., Bob Dylan, The Times They Are AChangin’, on The Times They Are a Changin’ (Columbia Records 1964) (“Come Senators, Congressmen, please heed the call. Don’t stand in the doorway, don't block up the hall.”).

. Bell’s stage name is "T-Bizzle.”

. Bell also explained that he did not immediately report the teachers’ misconduct to school authorities because, in his view, school officials generally ignored complaints by students about the conduct of teachers.

. Although the School Board claims that Bell's speech constitutes a "true threat,” this argument is without merit for the reasons explained in the panel majority opinion. See Bell v. Itawamba Cnty. Sch. Bd., 774 F.3d 280, 300-03 (5th Cir.2014) (explaining that Bell’s song did not constitute a "true threat,” “as evidenced by, inter alia, its public broadcast as a rap song, its conditional nature, and the reactions of its listeners”). In any event, as explained herein, the majority opinion does not conclude that Bell’s song was a true threat. See Maj. Op. pp. 396, 399-400. Nor could it.

. The majority opinion instead summarily concludes that the "misconduct alleged by Bell against the two teachers is, of course, not at issue.” See Maj. Op. p. 389. Of course, I agree that the veracity of these allegations is not the "issue” in this case anymore than the veracity of Westboro's signs was the "issue” in Snyder. What is at issue, however, is whether publicly protesting that alleged misconduct warrants "special protection” for Bell's speech. The answer to that question, as explained above, is yes. In any event, however, Bell has offered uncontroverted proof of the coaches’ sexual harassment of the minor female students in the form of sworn affidavits detailing that abuse, which were introduced into evidence in this case.

. In Stevens, the United States government had attempted to leverage similar arguments in defending a federal statute banning depictions of animal cruelty. 559 U.S. at 468-69, 130 S.Ct. 1577. The United States argued that “depictions of animal cruelty” should be added to the list of categories of unprotected speech, alongside obscenity, incitement, arid *414 defamation. Id. However, because there was no "tradition excluding depictions of animal cruelty from 'the freedom of speech’ codified in the First Amendment,” the Court refused to create a new category of unprotected speech for such depictions. Id. The Court also explicitly rejected "as startling and dangerous” the government’s contention that it could create new categories of unprotected speech by applying a "simple balancing test” that weighs the value of a particular type of speech against its social costs. Id. at 470, 130 S.Ct. 1577. According to the Court,
[t]he First Amendment’s guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the cost. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it.
Id. A subsequent, much more narrow version of the statute at issue in Stevens, was upheld by our court. United States v. Richards, 755 F.3d 269, 271, 279 (5th Cir.2014) (discussing history of 18 U.S.C. § 48 and upholding version that proscribed only "unprotected obscenity”), cert. denied, - U.S. -, 135 S.Ct. 1546, 191 L.Ed.2d 642 (2015).

. In so holding, the Court also explicitly rejected Justice Thomas’ contention in his dissent that minors have no right to speak absent their parents’ consent. Id. at 2736 n. 3 (noting that Justice Thomas "cites no case, state or federal, supporting this view, and to our knowledge there is none”). Although conceding that the government may have authority to enforce parental prohibitions in certain circumstances (e.g., forcing concert promot- , ers not to admit minors whose parents have forbidden them from attending), the Court nevertheless observed that “it does not follow that the state has the power to prevent children from hearing or saying anything without their parents’ prior consent. The latter would mean, for example, that it could be made criminal to admit persons under 18 to a political rally without their parents’ prior written consent — even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors.” Id. (emphasis in original).

. However, as explained above, Bell’s speech clearly had “social value” as it constituted speech on a matter of public concern.

. The Court in Brown echoed this principle in observing that government should, not be afforded greater deference to restrict speech when new communication technologies emerge. 131 S.Ct. at 2733 ("[W]hatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment’s command, do not vary' when a new and different medium for communication appears.”) (quoting Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 503, 72 *417 S.Ct. 777, 96 L.Ed. 1098 (1952)); accord Citizens United v. Federal Election Comm'n, 558 U.S. 310, 326, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) ("Courts, too, are bound by the First Amendment. We must decline to draw, and then redraw, constitutional lines based on the particular media or technology used to disseminate political speech from a particular speaker.”).

. Unfortunately, the majority opinion provides virtually no details about the identity of its apocryphal layperson. In any event, I am dubious that a school board may punish students for making statements at home and on the Internet that the most sensitive of listeners in society would find to be "threatening,” "harassing,” or “intimidating.” See Ashcroft, 542 U.S. at 674, 124 S.Ct. 2783 (Stevens, J. concurring) (‘.'I continue to believe that the Government may not penalize speakers for making available to the general World Wide Web audience that which the lea'st tolerant communities in America deem unfit for their children’s consumption.”). Nevertheless, by permitting school officials to punish off-campus speech like Bell’s pursuant to Tinker, the majority opinion announces a precedent whereby the First Amendment rights of minors outside of school are "only ... as strong as the weakest, or at least the most thin-skinned, listener in a crowd.” Cuff ex re. B.C. v. Valley Cent. Sch. Dist., 677 F.3d 109, 120 (2d Cir.2012) (Pooler, J., dissenting).

. As explained below, this framework makes sense for student speech occurring on campus, where school officials have competing interests in maintaining conduct in the schools. However, this standard is inappropriate where, as here, the school’s interest is comparatively attenuated.

. In Morse, the Court held that the First Amendment did not prevent school officials from punishing a student who unfurled at a school-sanctioned event a banner that reasonably could be perceived as promoting illegal drug use. 551 U.S. at 396, 127 S.Ct. 2618. Notably, the majority opinion in this case overstates Morse's narrow holding by describing that holding as extending to “grave and unique threats to the physical safety of students, in particular speech advocating illegal drug use.” See Maj. Op. p. 390 (emphasis added). Contrary to the majority opinion's description, Justice Alito's concurrence explicitly stated that the Court's holding was limited to the specific speech at issue in that case, viz., speech advocating drug use at a school event. See Morse, 551 U.S. at 425, 127 S.Ct. 2618 (Alito, J. concurring).

. For example, in concluding that Tinker applies to off-campus speech, the Eighth Circuit committed the same fundamental misreading of Tinker that the district court committed in the instant case. D.J.M. ex rel D.M. v. Hannibal Pub. Sch. Dist. No. 60, 647 F.3d 754, 765 (8th Cir.2011). Specifically, the Eighth Circuit read wholly out of context the Court’s statement in Tinker that schools may regulate student speech "in class or out of it,” 393 U.S. at 513, 89 S.Ct. 733 (emphasis added), in order to hold that the school district in that case was permitted to punish a student for his off-campus online speech pursuant to Tinker’s substantial-disruption framework. The majority opinion likewise commits the same error in emphasizing this very language in reasoning that Tinker applies to off-campus speech. See Maj. Op. p. 390.

. The majority opinion in Morgan ultimately held that the school officials’ conduct of prohibiting students from passing out religious messages on campus violated the constitution. 659 F.3d at 364 (explaining that Judge Elrod's opinion represented the majority opinion on this point). However, the majority of the en banc court found that the right announced was not “clearly established.” Id. The reason that “categorization” of the speech was important in that case was because of Establishment Clause concerns if the speech could be perceived as school-sponsored. Id. at 375. The analysis there has little to do with the matters at issue here.

.The majority opinion mischaracterizes our precedents by suggesting that we previously have held that Tinker applies to purely off-campus speech. See Maj. Op. pp. 390, 394. In Shanley, we held that school officials violated the First Amendment when they punished students for selling underground newspapers "near but outside the school premises on the sidewalk of an adjoining street, separated from the school by a parking lot.” 462 F.2d at 964. Although we held that the speech in question did not meet the Tinker standard, id. at 970, we did not hold that Tinker necessarily can be applied to uphold the punishment of a student for purely off-campus speech.
The same is true of our decision in Sullivan v. Houston Independent School District, 475 *425 F.2d 1071 (5th Cir. 1973). In Sullivan, the court did not apply the Tinker substantial-disruption test to assess whether school officials violated the First Amendment. The Sullivan court recognized that there is nothing per se unreasonable about requiring a high school student to submit written material to school authorities prior to distribution on campus or resulting in a presence on campus, and that it could not be seriously urged that the school’s prior submission rule is unconstitutionally vague or overbroad. 475 F.2d at 1076 (citing Shanley, 462 F.2d at 960; Pervis v. LaMarque Indep. Sch. Dist., 466 F.2d 1054 (5th Cir. 1972)). Instead, the court held that the school principal had disciplined a student for failure to comply with the school’s rules requiring prior submission to the school principal of all publications, not sponsored by the school, which were to be distributed on the campus or off campus in a manner calculated to result in their presence on the campus.- Id. at 1073, 1076. The student was disciplined for twice selling newspapers at the entrance of the school campus, to persons entering therein, without making prior submission of the papers, and for using profanity towards the principal ("the common Anglo-Saxon vulgarism for sexual intercourse”) and in the presence of the principal's assistants (specifically, "I don't want to go to this goddamn school anyway”). Id. at 1074. Thus, notwithstanding the Sullivan court’s references to Tinker in that decision, that opinion did not hold that the Tinker substantial-disruption test applies to off-campus speech.
In sum, contrary to its suggestion that its decision logically follows from our prior precedents, the majority’s opinion today is the first time our circuit has ever held that school officials may punish students’ purely off-campus speech pursuant to the Tinker framework.

. As explained above, allegations that coaches sexually harassed students were nothing new at Itawamba Agricultural High School when Bell composed his rap song. In 2009, Itawamba coach Bobby Hill was arrested and accused of sending sexually explicit text messages to a minor student.

. "Once a week,” if possible.

. For example, the majority opinion compares Bell’s rap song to the potential violence "signaled” in Ponce v. Socorro Independent School District, 508 F.3d 765 (5th Cir.2007) and LaVine v. Blaine School Distnct, 257 F.3d 981, 987 (9th Cir.2001). But even a cursory comparison between this case and the facts of those cases reveals the majority opinion’s flawed logic. In Ponce, a student brought to campus a private diary, which was written in the first-person narrative, and showed its contents to a classmate. 508 F.3d at 766. The diary detailed the plan of his "pseudo-Nazi” group to conduct coordinated "Columbine-style” shootings at his school and at other schools in the district. Id. As the Ponce opinion explains:
The notebook describes several incidents involving the pseudo-Nazi group, including one in which the author ordered his group "to brutally injure two homosexuals and seven colored” people and another in which the author describes punishing another student by setting his house on fire and "brutally murder[ing]” his dog. The notebook also details the group’s plan to commit a "[C]olumbine shooting” attack on Montwood High School or a coordinated "shooting at all the [district’s] schools at the same time.” At several points in the journal, the author expresses the feeling that his "anger has the best of [him]” and that "it will get to the point where [he] will no longer have control.” The author predicts that this outburst will occur on the *429 day that his close friends at the school graduate.
Id. Likewise, in LaVine, a student brought to campus a poem written in the first person describing how the narrator murdered without remorse 28 people at his school and which ominously concluded with the narrator’s prediction that he "may strike again.” LaVine, 257 F.3d at 983-84.

. See, e.g., Ponce, 508 F.3d at 767; Wynar v. Douglas Cnty. Sch. Dist., 728 F.3d 1062, 1065-66 (9th Cir.2013); LaVine, 257 F.3d at 985.

. For example, Wildmon testified: "I tried to make sure, you know, if I’m teaching, and if I’m scanning the classroom, that I don’t look in one area too long. I don't want to be accused of, you know, staring at a girl or anything of that matter.” Rainey testified that he no longer felt he could be as "hands on” with his female members of the track team, and thus "sometimes I tell the boys to go and work with the girls.”

. Even assuming arguendo these changes in the coaches' teaching and coaching styles could be classified as "disruptions,” the School Board has not presented any evidence to support a finding that such disruptions were “substantial,” as required by Tinker.

.During a seconds-long aside at the Disciplinary Committee hearing, Bell simply alluded to such statements by third parties. Neither Bell nor anyone else provided any details whatsoever about these third parties, nor did he specify whether he heard these statements himself or via a third party.

. The majority opinion cites no evidence to substantiate that the somewhat parallel language is anything more than a mere coincidence.